Kampingen, Florida, U.S. The next case is Sanofi-Adventis v. Dr. Reddy's Presenteus Cabe, Octavus Elizabeth Apotex Mylan, 2018, 1804, 08, and 09, Mr. Solander.  Good morning, your honors, and may it please the court. At the time that the district court entered its decision and its judgment with respects to claims 7, 11, 14-16, and 26, those claims had been canceled. Those claims could not block any defendant from launching a product, nor would deciding them have any effect on a party's ability to do anything at the time that the judgment Is cancellation irreversible in law? Yes, it cannot be brought back by re-examination or any other way as far as I know. Yes, it's irreversible. As such, the district court lacks subject matters jurisdiction over those disclaimed claims and the judgment and opinion applying those claims should be vacated. This doesn't go to subject matter jurisdiction per se, because either you have it or you don't, whether you know about it or not. Why didn't your client notify the district court of the cancellation in a timely fashion? Your honor, I believe we did do it in a timely fashion. It was shortly after the cancellation that we notified the court, and then there was briefing on that matter prior to the court's decision, and we Well, I remember there was a point in time in this record in which you told the court you weren't intending to proceed on certain of the claims. That's correct. But I don't remember that that document containing any notice or reference to the cancellation. Are you referring to your simple notice to the court that you intend not to proceed on certain claims and then the fact that you didn't offer expert testimony on them, or are you talking about actually submitting a copy of the cancellation? I'm talking about both, your honor. At trial, after the PTAB decision came down in the middle of trial, we decided to focus our case on only two claims and to drop all of the other claims. We told the defendants that. We told the court that. So did you file a statutory disclaimer in the PTO? We did, yes, but not at that time. So at that time, we then proceeded to finish the trial. Afterwards, we did not appeal the PTAB's decision with respect to those claims, and so they automatically will have been canceled. We then had a discussion with the district court via letter. The district court, the defendants were advocating to the district court that despite that fact that we had not appealed, those claims were still not canceled and still existed. So then, just to button that up, we filed a cancellation with the PTO, which we don't think was necessary because they would have been canceled at the time. What do you mean cancellation? There's a statutory disclaimer, right? Yes, your honor. Statutory disclaimer of the claims at that time. But you have a kind of belt and suspenders argument. The statutory cancellation is one reason they were dead, and the second one was that official cancellation under 318 would, in some amount of time, have automatically followed once you decided not to appeal the unpatentability rulings on those claims from the final written decision. That's correct, your honor. I also think there's a second set of suspenders when you drop claims at trial ordinarily. Two pairs of suspenders. Two pairs of suspenders. When you drop claims at trial ordinarily, that deprives the court of- Can I ask you a question? I think it's a simple, factual question, but you tell me. Do you dispute the dosages of cabozitaxel greater than 20 were known in the prior art and used to treat docetaxel-resistant prostate cancer? Your honor, there was an ongoing clinical trial at the time, and the prior art that was available to the court was a description of that clinical trial ongoing at the time. So there was a description in the art of a use of 25 milligrams- Greater than. Greater than. Greater than 25? Yes. Not that I'm aware of, your honor. So you do dispute that proposition? That greater than 25- Here's what I'm getting at. Yes. So the other side, as I understand it, and they'll correct me if I'm wrong, say that there are two ways in which they have a stake in including the six disclaimed claims in the judgment here. One has to do with claim preclusion. That's not what I'm interested in at the moment for this question. The other is they have like a little paragraph about issue preclusion. Their paragraph about issue preclusion says, with respect to claim 11, which is one of the six disclaimed claims, that they think that keeping claim 11 in the judgment would provide issue preclusion as to the proposition that, and now I'm just going to repeat what I asked you about, dosages of cabizetaxel greater than 20 milligrams, is that meters squared? Yeah. Milligrams per meter squared, yes. Milligrams per meter squared were known in the prior art and used to treat dosetaxel-resistant prostate cancer. One way that you could, maybe not the only way, but one way that you could answer that little bit of issue preclusion is to say, on that factual proposition, we don't dispute it. I think the better answer to that is the one we've pressed in our briefs, and that is, as I understand what they're saying, is if you combine 11, claim 11, and its dependency all the way up to claim 1, that is an issue preclusion on our later claims. What we're saying is, as those later claims survive, they're so materially different than that combination of claims, and that they are not dependent on, that the findings with respect to claim 1, for example, do not apply to those claims because of their different construction and their different limitations. I think that's the assertion we'll make. We are not abandoning claims to 25 milligrams. Just to be clear, there are other possible answers, but I just want to be sure. You are not prepared to say, and I'm, again, just reading their sentence, that dosages of cabozitaxel greater than 20 milligrams per meter squared were known in the prior ART and used to treat docetaxel-resistant prostate cancer. I agree with that factual finding. Not used to treat, used in a clinical trial. I don't agree that they were used to treat, that the dosage was known and in a clinical trial. That fact was known. Okay. Our claims do cover 25 milligrams per meter squared, as well as 20, so we are pressing those, the amended claims that we are pressing in the PTAP proceeding at the moment. I don't remember whether you said the following explicitly or not, but the reason you care about this, you want to get rid of these claims, has something or other to do with trying to make sure that you're not being able successfully to assert the amended claims, should they emerge from the PTAP. Right. That's the threat by the other side, that if this judgment survives and will be used later as some sort of collateral estoppel or claim preclusion or something with respect to claims that we might get in the future, yes. That's the problem. The issue though, your honor, is that that contingent possibility, the possibility that the PTAP will issue claims and at the time that the court decided this case, that the federal circuit would reverse the PTAP in the first instance. That's since happened, but we have to focus on when the district court. That happened a while ago. Has the board acted on remand yet? The board has just set a briefing schedule. One brief has been filed. The other one is due Friday. But the focus of this court's analysis should be at the time that the district court entered its opinion and entered its judgment. Did the district court at that time have subject matter jurisdiction? The fact that the claims no longer existed, the fact that they could not be asserted against any party, the fact that they did not need a decision of infringement on those claims in order to launch their products, distinguishes them from the Daiichi case and the 3M case. The fact that they would not affect another proceeding that was being stayed distinguishes them from the ITC versus Microsoft case. And the fact that those claims did not exist at the time distinguishes them from the Teva versus Novartis case. If I could turn to the 170 patent? Yes. Yes. So your honor, that decision should be upheld here because the court's finding that a person of ordinary skill in the art would not have been motivated by the prior art to simultaneously modify the C7 and the C10 carbons of dosotaxel by adding methoxy substituents was supported by substantial evidence and is not clear error. Moreover, the court found compelling evidence of non-obviousness with respect to failure of others and commercial success. Those findings are unchallenged on appeal. The defendants allege that the court made essentially three errors below. The first, that the court did not consider the hate reference. Turning to the hate reference, the court made a number of findings showing that the court clearly understood the hate reference and clearly understood the testimony about the hate reference. It found that the hate reference itself does not discuss taxanes. I understand that's not dispositive, but it is a factor in this analysis. It found that it was not cited in any of the many articles of prior art in the taxane field by any taxane researcher at the time, including not just persons of ordinary skill in the art, but all of the experts doing taxane research at the time. It discusses the hate reference, discusses a completely different class of compounds that have substantially different chemistry than taxanes, including having a charge on the molecule. The compounds in hate were tested for a completely different purpose. They were trying to block the action of hate, not trying to avoid it. Right, but do I understand that the other side's theory is that hate, and you're going to have to fix maybe more than one thing in this, hate shows that stuff that binds closely to the molecule that goes from the inside to the outside will block its, let's call it its pumping action. That suggests that we really want to keep a, we want a structure that isn't going to at all. I realize there's a gap, because that has nothing to do with preventing, essentially tying it up to prevent the blocking, but it tells you something about the action of this cross-membrane. Is it protein? I guess it's protein. It's a transmembrane protein, that's right. And therefore, we don't want, we would like a molecule that doesn't actually attach to it at all, because then that won't be moved. Right, your honor. So it's a question of interacting with the protein in a way that diminishes its function. So that can be done a number of different ways. As your honor mentioned, you could attach something to it which physically blocks it. Doesn't hate disclose phenothiazines? That's correct, your honor. Which are an entirely different class of compound. Absolutely, and there's lots of testimony in the record that the court observed about how they are different. They're planar, not conformed like taxanes. They have a, they're charged. They have an aromatic ring. That's right. The aromatic rings are planar, unlike the rings from taxanes. You are well into your rebuttal time. Do you wish to continue or save it? I'll save it, your honor. Mr. Aylol, you're going to take nine minutes and leave six for Ms. Rapolino, of which she will want to save one. So please proceed. That's correct. May it please the court, Andy Aylol for Appetax on behalf of all defendants cross appellants with respect to Sanofi's appeal. Your honors, in 2000, I'd just like to focus on something that Mr. Solander said in response to Judge Moore's question. Actually Sanofi never at any point during trial said, either formally or informally, or just simply said, we drop assertion of claims 7, 11, 14 through 16 and 26. They never said it in their post-trial briefing. They didn't do it until I believe... Subject matter jurisdiction is not waivable, right? That is correct, your honor. And if they had in fact divested themselves of that property right as though it never existed by having filed a statutory disclaimer prior to the conclusion of that trial, it divested the court of subject matter jurisdiction, did it not? It did not, your honor. Do you think the fact that they didn't give notice of it means it can't divest the court of subject matter jurisdiction? It can't, your honor, because there are some rights at issue here. And those rights, first and foremost, are patent certainty and the ability to enter the market in the face of patents that we don't infringe. So, can I ask you this question? Yes, your honor. Let me just tell you what's on my mind about this issue. It seems to me that you have said two things about why there is some stake, some concrete stake in your keeping the disclaim claims within the judgment. The first is a claim preclusion point, which is kind of your overwhelming point, and then you have this little issue preclusion point that I was talking about with your opposite number. But on claim preclusion, here's what I guess I'm stuck on. Your claim preclusion point is that, as you read the Senju case, the amended claims would have been encompassed within claims that Sanofi could have asserted, and indeed, in at least one respect, did assert in this case, and therefore there's going to be claim preclusion. And I will assume for purposes of this question that that's correct. That seems to me to be completely unaffected by whether the disclaimed claims are within the judgment. And that is correct, your honor. Because there remains a final judgment on these claims, not on these claims, I'm sorry, in the case, because 21 and 30 remain, and there's no question about removing them. That's correct, your honor. That's absolutely correct. So, what does this claim preclusion argument have to do with whether the disclaimed claims are in the judgment or not? It's only if Senju is read narrowly, your honor. It's only if Senju is read narrowly to require an actually adjudicated claim. But you can litigate that if and when the amended claims issue and they are asserted. You can say, claim preclusion, these are, Senju says, it's not just no material difference, it's also being a subset of the claims that you could have asserted, and indeed you did assert one of them by 1 or 27 or something, and you'll either win or you'll lose about that. But that argument, you would never mention or need to mention in the course of that argument whether the disclaimed claims are in this judgment. Your honor, if this court vacates on the disclaimed claims, and we make that argument that Sanofi is precluded from asserting the amended claims against us by virtue of the fact that it could have, in fact, did assert claims 1 and 27, we have the judgment on 2130. But Sanofi argues that Senju should be read narrowly such that, well, claims 1 and 27 were never taken to trial, and the only ones that were taken to trial and judgment was entered on were 21 and 30. And those claims are directed to the 20 milligram per meter squared dosage, not the up to 25. Then we're out of luck here. So it really depends on the court's reading. And so that's why we essentially have two positions with respect to justiciability over the disclaimed claims in this case. The first is that in assessing justiciability, of course, this court is going to have to apply the Supreme Court's all the circumstances test. As part of that, this court is going to have to determine whether Sanofi on the one hand and defendants on the other hand had adverse legal interests at the time the district court entered judgment over the disclaimed claims. And our position is if Sanofi was already precluded at the time the district court entered judgment from suing us a second time on the 592 patent by virtue of claims 1 and 27, then and only then will we agree that there was no justiciable controversy of the disclaimed claims at the time the district court entered. Right. So I'm not actually focusing on the conditions under which you will agree or not, but rather putting aside your agreement or let's assume that you resist this and then you say here are the reasons we're resisting it. We're worried about what we think we had a stake because of claim preclusion. And if the claim preclusion argument that you make is independent of whether the disclaimed claims are in the judgment, I don't see how that can give you a stake in inclusion or exclusion of the disclaimed claims. And then you do make this one little point, basically a single carryover sentence on some page or other in which you say keeping claim 11 helps us invoke issue preclusion about the district court's finding and it's the one that I read about four times before. And you cite appendix 91 and 96 through 97 and 91 is about claims 21 and 30, which are in the judgment. So and then 96 and 97 don't discuss the 20 milligram point at all. So again, I don't see what that issue preclusion point has to do with keeping the disclaimed claims in the judgment. If this court... You have that argument based on a part of the judgment that's not being asked to be altered, which is the discussion of 21 and 30. That's correct, Your Honor. We are focusing on the disclaimed claims. We're asking for judgment to be maintained on there if this court doesn't agree with us that Sanofi was already precluded based on 127 because we believe the judgment over issue preclusion as to dosages above the 20 milligrams per meter squared, which were the subject of 21 and 30. Which again is independent of the disclaimed claims being in the judgment or not. That's for 20, only for 20 because 21 and 30 were directed to the 20 milligram per meter squared dosage. But they don't cover the dosages, the higher dosages that the substitute claims are directed to. Do you want to address your cross appeal? Yes, I believe. I believe I still have time remaining. You have less than two minutes, but... Okay. My colleague's going to be addressing the cross appeal. All right. Fine. So just short of this court agreeing with us that Sanofi was already precluded from suing a second time, we believe there's justiciable controversy over the disclaimed claims at the time the district court entered judgment because we meet all the Tavivino-Vardis factors for justiciability. Sanofi's only response is, well, there in Tavivino-Vardis, the four unasserted Van were live and presently assertable. Well, that should not drive this court's analysis because we have the Carrico and Daiichi line of cases which hold that claims do not need to be live and presently assertable for there to be a justiciable controversy over those claims. And so to the extent this court feels that we're not 100% on all fours with Tavivino-Vardis, one way to look at this is that we are essentially a hybrid between Tavivino-Vardis on the one hand and this court's Carrico and Daiichi line of cases on the other hand. The patent uncertainty is posing a barrier to market entry. If this court reverses on the 170, some of us may not go to market by virtue of the uncertainty on the 592 patent. If this court affirms and the IPR is resolved in Sanofi's favor before September of 2021, Sanofi is likely going to be suing us for preliminary and permanent injunctive relief to keep us off the market. We respectfully submit that that's the antithesis. Why are you saying some of us would not go to market if the amended claims haven't even issued yet? Why would you not go to market? Because of the uncertainty, Your Honor. And Congress amended... That's the quintessential definition of an advisory opinion. What you just said is the textbook definition of an advisory opinion. In this case, Your Honor, Congress amended the Hatch-Waxman to specify that when Hatch-Waxman litigation is properly instituted, an and a filer is guaranteed certainty as to that patent, good or bad. And so that's why we respectfully maintain that there continues to be a justiceful controversy of the disclaimed claims if Sanofi was not already precluded. I will yield the rest of my time to my colleague for the cross-appeal. Thank you. Let me say we have no objection to an associate coming up and giving you a note, but he was about to come up four times, which is disruptive. My apologies, Your Honor. My apologies. Ms. Rapolino. Thank you. Good morning. May it please the court, I am going to address defendant's cross-appeal on the 170 patent. The district court here made one significant legal error, not the three errors that Mr. Solander talked about. And if this court corrects that single legal error, then the district court's own fact findings compel a conclusion of obviousness. That legal error, it's not the legal error that Mr. Solander pointed out of not considering the Haight and Lampetus references. Instead, that legal error is the district court's limiting its analysis of those two key prior art references, Haight and Lampetus, exclusively to the explicit teachings of those references. By doing that, the district court found that those two references were not, the teachings of those references were not relevant to tax zanes because they didn't explicitly address tax zanes. Even though- You're talking about Haight? I'm talking about both the Haight and Lampetus prior art references. They didn't fail to explicitly address tax zanes. It was an entirely different chemical field. So it is true that the Haight reference taught that the compounds discussed in Haight were phenothiazines. But the subject of the Haight reference was the PGP protein. And there was evidence, and the district court, in dismissing the relevance of Haight, didn't dismiss Haight because it was a different class of compounds. When you look at the district court's opinion, this is at appendix 52, the district court said that it- If this is a claim to a chemical compound, then one skilled in the art, starting with doxy taxane, would not have looked to the phenothiazine art for determining whether to put a methoxy on the 7 and the 10 groups. Well, the evidence at trial was to the contrary. So the district court didn't address, didn't even mention the evidence at trial, the real They're only expert who actually worked in the taxing field at the relevant time. Dr. Ojima's testimony was that he took account of Haight in designing taxanes, that he was aware of Haight, and he took account of it in designing his own taxanes. And this was at appendix 24, 286. In addition, Kalaniff's own other expert, Dr. Ludwania, offered testimony that despite the structural differences between phenothiazines and taxanes, there was another prior art reference, the Greenberger prior art reference. So this is Greenberger and Safa. These are two references not addressed by the district court, and Dr. Ludwania's testimony also was not addressed by the district court. Dr. Ludwania clearly testified that the Greenberger reference showed that there was common ground between phenothiazines and taxanes and their interaction with PGP, and specifically that they shared a common binding site on PGP. This was at appendix 24, 249. None of that testimony was addressed by the district court, which leads to the conclusion that the district court, in dismissing Haight and Lampetus, wasn't relying on actual factual distinctions between an expert testimony distinguishing phenothiazines from taxanes, but rather on the lack of an explicit disclosure in Haight and Lampetus of taxanes. Where the district court got the legal standard right, the district court's factual findings actually support obviousness. So if we turn to some of those factual findings, first, the district court properly found that the person of skill in the art would have identified docetaxel along with paclitaxel as a lead compound at the relevant time. Second, the district court also properly found that the person of skill in the art would have identified multidrug resistance as the problem with docetaxel and would have been motivated to modify docetaxel to overcome that. And importantly, the district court found that in addressing that problem, the person of skill in the art would be focused on P-glycoprotein, or PGP. Third, the district court made findings about Haight and Lampetus. The district court found that those references taught strategies for overcoming or disrupting binding to PGP based on the physical properties of the compounds studied in those references, specifically based on improving the lipophilicity of those compounds. And finally, the district court also properly found that cabazitaxel's properties were not entirely unexpected. The POSO would have expected cabazitaxel to have improved potency over docetaxel. In other words, the district court made findings that support the person of skill in the art's reasonable expectation of success. Really the only element that the district court found missing in the obviousness analysis was the motivation to make simultaneous modifications at C7 and C10 of docetaxel. But that finding was based on its erroneous finding that the person of skill in the art would not have looked at Haight and Lampetus to solve the PGP problem, the very problem that the person of skill in the art would have been concerned with, just because those of compounds. That was legal error under this court's precedent in Alza v. Milan. The court must take into account not only the explicit- You say that was an underlying error infecting the determination that proof was not adequate that among the many, many, many possible choices for modifying at different places and different ways that this one would have been selected. Why does that actually harmfully infect that conclusion when there are so many other choices and others were choosing a lot of different locations to make modifications at? So I would make two points in response to that. First, the court's dismissal of the relevance of Haight and Lampetus to taxanes means that the court didn't take account of the fact that Haight and Lampetus directly point the hydrophilic substituents in the northern hemisphere, which are the C7 and C10 positions. So that legal error of dismissing Haight and Lampetus infects the motivation to modify those two positions. The second point I would make is that to the extent the district court talked about the modifications being made all over the taxane core, the evidence was that those modifications simply weren't relevant to the obviousness analysis because those didn't happen at the relevant time. The relevant time under Allegan v. Apotex for assessing the state of the art is at the priority date, not before. And the evidence at trial from plaintiff's inventor, Dr. Bouchard, was that those modifications that had been made all around the taxane core had already been published as of the priority date in the Commerson reference. And so the modifications that had been made mostly by Sanofi's own predecessor, RPR, prior to the priority date simply aren't relevant to what was known to the person of ordinary skill in the art as of the priority date. If there are no further questions, I would like to reserve my remaining time. We will give you a minute to respond, as you have requested. Mr. Solon, tell us why the fact that Haight discusses phenothiazines isn't the point, that the interaction with the PGP protein is what counts. Your Honor, the question is, would a person of ordinary skill in the art in the taxane field have taken into account that model in designing changes to the taxane molecule? The answer is nobody ever did, and nobody ever would, because that model, first of all, it's totally hypothetical based on a different protein, calumetin. They don't know what the structure of PGP is. He's hypothesizing that it might look like this other protein, calumetin. It says it right in the Haight reference. He's hypothesizing that that's how it interacts with the phenothiazines. As Your Honor noted, the taxane molecule is completely different. There's no teaching that the taxane molecule interacts with that binding model in the same way that the phenothiazine molecule does. They rely on the Greenberger and Safa references, but all those say is that within a relatively large domain of the PGP molecule, photoaffinity label experiments show that chemotherapy drugs and these chemosynthesizers interact. They don't say how they interact, which is critically important, and the testimony from Dr. Ladoinia was crystal clear on this point. I have no idea how those interact, and therefore, if you don't know how they interact, how can you change a molecule to better that interaction without doing experiments and SAR? Second, when Dr. Ladoinia saw the Greenberger reference, he said, this completely undercuts Haight. There's no way what Greenberger says is true, that all these molecules of very different shapes, of very different sizes, interact with the PGP molecule at roughly the same domain. He said, then it's impossible that the Haight model is right. It completely contradicts the Haight model. As to Dr. Ojima, this notion that Dr. Ojima was looking at Haight as a person of ordinated skill in the art, well, first of all, he's an expert, and second of all, he was asked the question, I'm just focusing on what was going on in March 1995, the relevant date, and clearly, it shows that you were at least considering the Haight binding model for taxanes. Is that correct? No. I said that is no. The testimony they quote in their brief, where he says he took that into account, was later research on chemosensitizers. Those are the type of compounds that were being studied in Haight. Not phenolthiazines, but compounds that block the action of PGP. Of the things that you've said in the last three or four minutes, how much is reflected in district court findings? The district court findings, a lot of what I said is not reflected in district court findings, except that the district court was right to find that Haight was not applicable. It's supported by substantial evidence in the record, including all of the points beyond just the notion that it doesn't cite taxing that the district court explicitly said, including that the compounds were different, different chemistry, used for a different purpose, has no information about the actual binding site of PGP, a hypothetical model based on a totally different protein that's in A50 of the court's findings. Our testimony is clear that he could believe, and that is that Drs. Rausch and LaDuana said that Oposa would not have considered Haight helpful in designing molecules. Thank you, counsel. Your time has concluded. Thank you. Ms. Mappalino has a minute for response. Judge Taranto, I think your question is a critical point here, that the district court simply didn't take into account, and there's no evidence that the district court considered, any of the contrary evidence that any structural differences between the Haight compounds, phenothiazines, and taxines made any difference to the person of skill and the art in terms of its applicability to taxines. That suggests, again, that the district court's standard that it applied here in determining that Haight and Lampetus weren't relevant to taxines was based on legal error. It was based on a lack of an explicit teaching rather than an analysis. District court said Haight was not cited in any prior art taxine references, including those discussed by defendants' experts. It only provides a hypothetical binding molecule for calmodulin, which is different from and unrelated to PGP. Right. So the district court cited that but did not take into account or address or mention the testimony, the evidence, or the prior art that suggested otherwise. In other words, the district court, there's no evidence that the district court weighed that expert testimony and those fact findings in determining that the reason that Haight was inapplicable to taxines had to do with any of the structural differences rather than just a lack of an explicit teaching. Do you have a final thought? Well, my final thought is that if this court does reverse the legal error and applies the teachings of Haight and Lampetus to taxines, finds that a person of skill in the art would have applied those teachings to taxines, then the obvious thing for the person of skill in the art to do would be to make those C-7 and C-10 positions more lipophilic using the very substitutions that are found in cabazitaxel, rendering cabazitaxel obvious. Thank you. We will take the case under review.